## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRYAN CLAYTON, EUJUNE KIM, JASON KLEE, DARLENE LEHMAN, AND SVITLANA MALENFANT Individually and on Behalf of All Others Similarly Situated, on Behalf of the AON SAVINGS PLAN | Case No. 1:26-cv-6026 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| AON CORPORATION, the BOARD OF DIRECTORS OF AON PLC and its members, and the AON RETIREMENT PLAN GOVERNANCE AND INVESTMENT COMMITTEE, and its members, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

NATURE AND SUMMARY OF THE ACTION ............................................................... 1

JURISDICTION AND VENUE ......................................................................................... 4

THE PARTIES .................................................................................................................... 4

    I.    Plaintiffs ................................................................................................................. 4

    II.    Defendants ............................................................................................................. 6

SUBSTANTIVE ALLEGATIONS ..................................................................................... 7

    I.    The Plan ................................................................................................................. 7

    II.    Defendants Breached Their Fiduciary Duties Under ERISA ................................ 9

        A.    Fiduciary Duties Under ERISA .................................................................. 9

            1.    Duties of Prudence and Loyalty ..................................................... 9

            2.    Fiduciary Liability Under ERISA .................................................. 10

            3.    Co-Fiduciary Liability Under ERISA ............................................ 10

        B.    The US ACP Has Consistently Underperformed as Compared to Meaningful Benchmarks ............................................................................ 11

            1.    The US ACP and Its Benchmarks and Comparators ........................ 11

            2.    The US ACP's Chronic Underperformance .................................... 14

         C.    The Capital Opportunity Fund Has Consistently Underperformed as Compared to Meaningful Benchmarks ...................................................... 16

            1.    The Capital Opportunity Fund and Its Benchmarks and Comparators ...................................................................................... 16

            2.    The Capital Opportunity Fund's Chronic Underperformance .......... 20

        D.    Defendants Violated Their ERISA Fiduciary Duties by Failing to Timely Remove the Consistently Underperforming Subject Funds ...................... 24

CLASS ACTION ALLEGATIONS ................................................................................... 26

CAUSES OF ACTION ...................................................................................................... 29

    COUNT I ............................................................................................................... 29

    COUNT II .............................................................................................................. 31

PRAYER FOR RELIEF .................................................................................................... 33

**INTRODUCTION**

1.    Plaintiffs Bryan Clayton, EuJune Kim, Jason Klee, Darlene Lehman, and Svitlana Malenfant ("Plaintiffs"), individually, on behalf of the Aon Savings Plan (the "Plan"), and as representatives of a class of participants and beneficiaries of the Plan, by and through their counsel, bring this Complaint for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA") against defendants Aon Corporation, the Board of Directors of Aon plc and its members (the "Aon Board"), and the Aon Retirement Plan Governance and Investment Committee and its members (the "Investment Committee" or the "RPGIC") (collectively, the "Defendants").

2.    Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

**NATURE AND SUMMARY OF THE ACTION**

3.    This is a class action on behalf of the Plan, and a class of participants and beneficiaries of the Plan, against fiduciaries of the Plan arising from their breaches of fiduciary duties under ERISA.

4.    ERISA requires fiduciaries of retirement plans to closely monitor investments, remove imprudent investments, and make investment decisions based solely on the interests of participants in retirement plans.  *See* 29 U.S.C. § 1104(a)(1).  Courts have described these duties of loyalty and prudence as "'the highest known to the law.'" *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 943 (7th Cir. 2024) (quoting *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021)).

1

5.     Here, Plaintiffs bring this action under 29 U.S.C. § 1132(a)(2) and 1132(a)(3), alleging that Defendants—the Plan's fiduciaries—breached their duties by: (1) retaining underperforming investment options—(i) the Vanguard U.S. All Company Portfolio ("US ACP"); and (ii) the Vanguard Capital Opportunity Fund ("Capital Opportunity Fund," and together with US ACP, the "Subject Funds")—for the Plan between 2019 and 2025, despite more suitable U.S. multi-cap, large growth/large blend funds having been readily available; and (2) failing to monitor the fiduciaries responsible for administration and management of the Plan's actions in retaining the imprudent Subject Funds as investments for the Plan.

6.     Defendants' breaches and imprudent investment decisions have resulted in a loss of more than $120 million in assets for the Plan and its participants.

7.     The Plan is a defined contribution retirement plan under 29 U.S.C. § 1002(34) and is sponsored by Aon Corporation.  As evidenced by its tax-deferred qualities, the primary purpose of the Plan is to allow participants to save for retirement.

8.     Defendant Aon Corporation is the "sponsor" under 29 U.S.C. § 1002(16)(B) and a "named fiduciary" of the Plan.  Aon Corporation is a wholly-owned subsidiary of Aon plc (Aon Corporation and Aon plc are referred to herein as "Aon"), which acts through a Board of Directors.

9.     The Investment Committee is a named fiduciary for the purposes of Plan investments.  As part of that process, the Investment Committee designates the investment options available under the Plan.

10.    The Aon plc's Organization and Compensation Committee of the Board of Directors has established the Global Benefits Governance Committee, which is responsible for appointing members of the Investment Committee.  Through this delegation chain, the Aon plc

2

Board exercises ultimate authority over the appointment, retention, and removal of the fiduciaries responsible for selecting and monitoring the Plan's investment options.

11. The Aon plc Board has designated and appointed the Investment Committee as responsible for administering the Plan and the "named fiduciary" with the full authority to control and manage the operation and administration of the Plan. The Investment Committee is responsible for appointment, retention, and removal of the Plan's trustees and investment managers who hold the assets or manage the investment of the funds in the Plan.

12. The Investment Committee has delegated several aspects of the day-to-day administration of the Plan to its appointed plan administrators and/or trustees.

13. When designating the different investment options for inclusion in the Plan, Defendants were required to independently investigate and regularly monitor each of the Plan's investment options with the care and skill of a prudent investor. 29 U.S.C. § 1104(a)(1)(B).

14. Rather than acting diligently and prudently, Defendants breached their fiduciary duties by retaining the US ACP and Capital Opportunity Fund as investment options for the Plan from May __, 2020 through the date of judgment (the "Class Period") despite: (i) the US ACP having underperformed its peer benchmarks on a trailing three-year basis for up to seven consecutive years (2019-2025), a trailing five-year basis for up to six consecutive years (2020-2025), and a trailing ten-year basis by 2025, and on a cumulative basis; and (ii) the Capital Opportunity Fund having underperformed its peer benchmarks on a trailing three-year basis for up to seven consecutive years (2020-2025), a trailing five-year basis for up to seven consecutive years (2019-2025), and a trailing ten-year basis for up to two years (2024-2025), and on a cumulative basis. The Subject Funds suffered from ongoing quantitative deficiencies resulting in massive

underperformance relative to that of well-established, prudently managed, comparable funds that Defendants could have selected for the Plan.

15. Based on Defendants' conduct, Plaintiffs bring this action on behalf of the Plan, and as representatives of a class of participants and beneficiaries of the Plan, asserting claims for a breach of the fiduciary duty of prudence (Count One), and for failure to monitor fiduciaries (Count Two). In connection with these claims, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches, all profits earned by Defendants in connection with Defendants' breaches, and other appropriate relief.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this action arises under 29 U.S.C. § 1132(a).

17. This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district where the Plan is administered, at least one of the alleged breaches took place, and where Defendant Aon Corporation is headquartered.

## THE PARTIES

### I. Plaintiffs

18. Plaintiffs bring this suit individually, on behalf of the Plan, and on behalf of a class of participants and beneficiaries of the Plan affected by the challenged conduct of Defendants.

19. Plaintiff Bryan Clayton was employed as a VP Producer with Aon from November 2022 through March 2025, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period. Clayton suffered individual injury by investing in the Plan's poorly performing Subject Funds. Clayton is invested in the Capital Opportunity Fund.

20. Plaintiff EuJune Kim was employed as a Health and Benefits Analyst with Aon from February 2022 through March 2024, and was a participant in the Plan, as defined in 29 U.S.C.

4

§ 1002(7), during the Class Period.  Kim suffered individual injury by investing in the Plan's poorly performing Subject Funds.  Kim is invested in the US ACP and the Capital Opportunity Fund.

21.     Plaintiff Jason Klee was employed as a Financial Analyst with Aon from September 2020 through November 2021, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period.  Klee suffered individual injury by investing in the Plan's poorly performing Subject Funds.  Klee is invested in the Capital Opportunity Fund.

22.     Plaintiff Darlene Lehman was employed by Aon, first as a Legal Assistant and later as an Account Specialist, from November 2004 through March 2025, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period.  Lehman suffered individual injury by investing in the Plan's poorly performing Subject Funds.  Lehman is invested in the US ACP and the Capital Opportunity Fund.

23.     Plaintiff Svitlana Malenfant was employed by Aon as a Team Lead for Technology and Analytics, from 2021 through 2023, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period.  Malenfant suffered individual injury by investing in the Plan's poorly performing Subject Funds.  Malenfant is invested in the US ACP and the Capital Opportunity Fund.

24.     As detailed *infra*, the Plan has suffered over $120 million in losses resulting from the fiduciary breaches at issue and remains vulnerable to continuing harm.  As participants in the Plan, Plaintiffs have standing to bring claims in a representative capacity on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2), and on behalf of all holders of funds in the Subject Funds because they suffered actual injuries to their accounts in which they held the Subject Funds during the Class Period and the alleged harms to holders of the Subject Funds can be traced to the same

5

challenged conduct: the participants in the Plan suffered financial harm as a result of the Plan's imprudent investment options and the process Defendants used to monitor and retain the Subject Funds. This singular conduct with respect to the Plan harmed each of the holders of the specific funds included in the Subject Funds at issue in this action.

## II.      Defendants

25.      Defendant Aon Corporation is a global professional services firm, providing a broad range of risk, retirement and health solutions; its core services include insurance and reinsurance brokerage, human capital and benefits consulting, wealth and retirement solutions, and enterprise risk management. Aon's operational headquarters in the United States is located in Chicago, Illinois. Aon Corporation is the "sponsor" of the Plan and "named fiduciary" within the meaning of 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1102(a). Aon acts through a Board of Directors.

26.      Aon, through its Investment Committee, is also the "plan administrator," with general oversight responsibilities for the Plan. As plan administrator, Aon is a fiduciary. *See* 29 C.F.R. § 2509.75-8 at D-3. Additionally, as the "plan sponsor," "plan administrator," and the entity responsible for appointing and removing members of the Investment Committee, Aon had knowledge of the fiduciary breaches committed by the other Defendants, and did not make reasonable efforts under the circumstances to remedy those breaches.

27.      Defendant the Aon plc Board is a fiduciary of the Plan responsible for appointing and monitoring the Plan's fiduciaries. Through its Organization and Compensation Committee, the Aon plc Board has established the Global Benefits Governance Committee, which appoints members of the Investment Committee. The Aon plc Board, through this delegation chain, exercises ultimate authority over the appointment, retention, and removal of fiduciaries responsible for the Plan's investment-selection and monitoring processes. As the appointing fiduciary, the

6

Aon plc Board had knowledge of the fiduciary breaches committed by the other Defendants, and did not make reasonable efforts under the circumstances to remedy those breaches.

28.     Defendant the Aon Retirement Plan Governance and Investment Committee (referred to herein as the "Investment Committee" or "RPGIC") is the named fiduciary for purposes of Plan investments.  The Investment Committee is responsible for designating the investment options available under the Plan and for selecting and monitoring those investment options.  It is also a "named fiduciary" within the meaning of 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1102(a).  Current and former members of the Investment Committee are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting management of the Plan.  The Investment Committee has delegated at least some of its day-to-day administration of the Plan to administrators and/or trustees.

## SUBSTANTIVE ALLEGATIONS

**I.      The Plan**

29.     The Plan is a defined contribution plan subject to the provisions of ERISA.

30.     A "defined contribution" plan is a retirement plan in which an individual account is set up for each participant with benefits based upon the amount contributed to the participant's account (through employee contributions and, if applicable, employer contributions), and "any income, expenses, gains and losses."  29 U.S.C. § 1002(34).

31.     The Plan is established and maintained under written documents as required by 29 U.S.C. § 1102(a).

32.     Defendant Aon Corporation is the "sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B).

33. The Plan pays expenses from the Plan's assets, and administrative expenses are paid by participants as a reduction of investment income.

34. Defendants, through Aon's Investment Committee, determined the appropriateness of the Plan's investment offerings and monitored investment performance.

35. The Plan is a participant-directed defined contribution plan, meaning participants may direct the investment of their contributions into various investment options offered by the Plan.

36. As of December 31, 2024, the Plan provides for retirement income for approximately 25,000 participants, comprised of Aon employees, former employees, and their beneficiaries.

37. At the choice and discretion of Defendants, various investment options were made available to the Plan's participants.

38. Poor investment performance can significantly impair the value of a participant's account. Fiduciary decisions have the potential to dramatically affect the amount of money participants can save for retirement.

39. In 2024, the Plan had approximately 25,000 participants and thus had more participants than 99% of the defined contribution plans that filed Form 5500s for the 2024 year.

40. As of February 2025, the Plan had approximately $6.7 billion in assets entrusted to the care of the Plan's fiduciaries. The Plan had more assets than 99.4% of the defined contribution plans that filed Form 5500s for the 2024 year. The table below displays the approximate value of assets invested in each of the funds at issue:

8

| Fund Name | Amount Invested |
|---|---|
| US ACP | $788,500,000 |
| Capital Opportunity Fund | $372,700,000 |
| **Total** | **$1,161,200,000** |

## II.     Defendants Breached Their Fiduciary Duties Under ERISA

### A.     Fiduciary Duties Under ERISA

#### 1.  Duties of Prudence and Loyalty

41.     Under ERISA, in addition to named fiduciaries, any other persons who perform fiduciary functions are treated as fiduciaries.  *See* 29 U.S.C. § 1002(21)(A); 29 U.S.C. § 1102(a)(1).

42.     ERISA imposes strict fiduciary duties of prudence and loyalty upon retirement plan fiduciaries.  29 U.S.C. § 1104(a).  These duties apply to all fiduciary acts, including the Defendants' retention of investment options for the Plan.  ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B).

43.     Importantly, the fact that participants may direct the investment of their contributions in a defined contribution plan account "does not serve to relieve a fiduciary from its duty to prudently select and monitor any . . . designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(2)(iv).

44.     Fiduciaries have "the continuing duty to monitor [Plan] investments and remove imprudent ones" that exist "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).  Prudence requires a review at "regular intervals." *Id.*

9

45. "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If "fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) (citing *Tibble*, 575 U.S. at 529-30).

46. When considering whether to retain a U.S. equity fund or a large-capitalization fund as an investment option in a plan, a prudent fiduciary would evaluate the entire universe of similar funds available based on qualitative and quantitative metrics, such as trailing 3, 5 and 10-year performance relative to peer benchmarks.

2. Fiduciary Liability Under ERISA

47. Under 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to make good to the Plan any harm caused by their breaches of fiduciary duty. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

3. Co-Fiduciary Liability Under ERISA

48. ERISA also imposes co-fiduciary liability where a plan fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty of another fiduciary if:

> 1. he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

10

2. if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

3. if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

**B.      The US ACP Has Consistently Underperformed as Compared to Meaningful Benchmarks**

1. <u>The US ACP and Its Benchmarks and Comparators</u>

49.      The US ACP has existed since approximately 2015 and has been part of the Plan since 2019.   The US ACP's investment objective "seeks long-term capital appreciation by investing in the U.S. equity market."   Its investment strategy has been described as "a 'fund of funds,' which is a term used to describe funds that pursue their investment objective by investing in multiple underlying funds."

50.      The US ACP's prospectus benchmark is the Dow Jones U.S. Total Stock Market Float-Adjusted Index (the "DJ US TSM" or "Prospectus Benchmark").   Plaintiffs include data and performance comparisons against this benchmark.

51.      The US ACP is a U.S.-focused all-company equity fund designed to achieve long-term capital appreciation through diversified investment in U.S. equity securities.   The US ACP is directly comparable to other actively managed, U.S.-focused equity funds that invest across the U.S. equity market and that are offered in defined contribution plans.

52.      When considering whether to retain a U.S. all-company equity fund in a plan, a prudent fiduciary would evaluate that fund's risk and return characteristics as compared to the entire universe of comparable funds available based on qualitative and quantitative metrics.

53.      All U.S.-focused all-company equity funds are designed to achieve long-term capital appreciation through primary investment in U.S. equity securities across the market-

11

capitalization spectrum. As such, these funds share similar risks such as risk associated with the fund manager's selection of securities or funds to invest in, investment style risk, and market risk arising from exposure to U.S. equity markets.

54. Plaintiffs have identified four comparator funds for the US ACP. These comparator funds are offered by major market vendors and were selected based on their similar characteristics to the US ACP—characteristics such as size, category, asset allocation, and risk ratio. Had Defendants opted to replace the US ACP, they likely would have worked with one of the comparator funds listed.

55. Additionally, each of these comparator funds shares the same investment objective and approach as the US ACP—long-term capital appreciation through diversified U.S. equity exposure—and Morningstar has classified each of these comparator funds within the same "Morningstar Category" as the US ACP—the "Large Blend" category. *See Gaines v. BDO USA, LLP*, 663 F. Supp. 3d 821, 829-30 (N.D. Ill. 2023) (accepting allegations of underperformance as compared to comparator funds within the same Morningstar fund category and benchmarked to the same index).[1] Plaintiffs have selected the following comparator funds for the US ACP:

---

[1] Funds are placed into a Morningstar Category based on the similarities of their holdings, portfolio statistics, and compositions over the prior three years. Morningstar describes the "Large Blend" category as including portfolios "where neither growth nor value characteristics predominate" and notes these "portfolios tend to invest across the spectrum of U.S. industries." *See* Morningstar, *Large Blend Category Definition*, *available at* https://awgmain.morningstar.com/webhelp/glossary_definitions/categories/category_Large_Blend.htm.

| Fund | ACP Comparators[2] |
|------|--------------------|
| **US ACP** | Fidelity Total Market Index ("FSKAX") |
| | Federated Hermes MDT All Cap Core R6 ("QKACX") |
| | Strategic Advisers U.S. Total Stock Fund ("FSAKX") |
| | Principal Capital Appreciation Inst ("PWCIX") |

56.     Because of their similarities, the US ACP and all four ACP Comparator Funds also share the same risks, including risks associated with the manager's selection of securities, and investment style risk.

57.     The ACP Comparators are particularly appropriate comparators in the context of a defined contribution retirement plan because they occupy the same role within a plan's investment lineup—namely, actively managed US-based all-cap equity options intended to provide participants with long-term equity strategies.

58.     The ACP Comparator Funds are all widely available institutional share-class mutual funds that pursue materially similar mandates and invest in the same segment of the U.S. equity market as the US ACP.  Accordingly, the ACP Comparators represent meaningful peer funds against which a prudent fiduciary would evaluate whether the US ACP delivered competitive performance and value for the Plan's participants.

59.     Based on the similarities of the ACP Comparator Funds' investment objectives, similar investment styles, portfolio construction approaches, and risks, the ACP Comparators represent meaningful comparators to the US ACP.  When combined with the Prospectus Benchmark (DJ US TSM), Plaintiffs have identified meaningful benchmarks that provide a sound basis of comparison to the US ACP.

---

[2]     The term "ACP Comparators" as used herein refers collectively to: (1) FSKAX, (2) QKACX, (3) FSAKX, and (4) PWCIX.

13

2.  The US ACP's Chronic Underperformance

60.     As detailed below, the US ACP has significantly underperformed both its Prospectus Benchmark, and its peer ACP Comparators on a trailing 3, 5, and 10-year basis and a cumulative basis.

61.     The US ACP's underperformance has undermined the retirement savings of participants in the Plan since at least 2019.  Table 1.a below illustrates the US ACP's performance as compared to its Prospectus Benchmark based on: (i) yearly returns for the years 2016-2025; (ii) trailing three-year returns for the years 2018-2025; (iii) trailing five-year returns for the years 2020-2025; and (iv) a trailing ten-year return for 2025:

Table 1.a
**US ACP**
Annual and 3-Year, 5-Year, and 10-Year Trailing Returns vs. Prospectus Benchmark[3]

| Fund / Bench | Annual Performance | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **US ACP** | 13.37 | 24.2 | -4.45 | -14.1 | 19.16 | 25.9 | -21.53 | 27.51 | 21.26 | 15.87 |
| DJ US TSM | 12.62 | 21.16 | -5.3 | 30.90 | 20.79 | 25.66 | -19.53 | 26.06 | 23.88 | 17.05 |
| *Alpha* | 0.75 | 3.04 | 0.85 | -45.00 | -1.63 | 0.24 | -2 | 1.45 | -2.62 | -1.18 |
| **Trailing 3** | - | - | 4.7 | -42.85 | -45.44 | -45.77 | -3.37 | -0.34 | -3.18 | -2.37 |
| **Trailing 5** | - | - | - | - | -43.64 | -46.4 | -46.08 | -4.53 | -4.1 | -43.36 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -45.68 |

62.     Table 1.b below illustrates the US ACP's performance as compared to the ACP Comparators based on: (i) yearly returns for the years 2016-2025; (ii) 3-year trailing returns for the years 2018-2025; (iii) 5-year trailing returns for the years 2020-2025; and (iv) a 10-year return for 2025:

---

[3]     Unless stated otherwise, all numerical figures in charts throughout this Complaint represent percentage values (%).

14

Table 1.b
**US ACP**
Annual and 3-Year, 5-Year, and 10-Year Trailing Returns vs. ACP Comparators

| Fund | Annual Performance | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **US ACP** | 13.37 | 24.2 | -4.45 | -14.1 | 19.16 | 25.9 | -21.53 | 27.51 | 21.26 | 15.87 |
| FSKAX | 12.68 | 21.18 | -5.28 | 30.92 | 20.78 | 25.65 | -19.51 | 26.12 | 23.88 | 17.05 |
| QKACX | 11.77 | 21.15 | -2.5 | 26.89 | 21.96 | 31.25 | -14.04 | 23.54 | 31.06 | 20.27 |
| FSAKX | 10.82 | 22.55 | -5.82 | 31.7 | 19.32 | 27.99 | -17.34 | 26.82 | 25.67 | 16.52 |
| PWCIX | 9.25 | 21.07 | -3.15 | 32.69 | 18.81 | 27.95 | -16.12 | 25.42 | 26.22 | 13.53 |
| *Delta* | 2.24 | 2.71 | -0.26 | -44.65 | -1.06 | -2.31 | -4.78 | 2.04 | -5.45 | -0.97 |
| **Trailing 3** | - | - | 4.74 | -43.3 | -45.38 | -46.5 | -7.96 | -5.08 | -8.13 | -4.46 |
| **Trailing 5** | - | - | - | - | -42.64 | -45.19 | -49.19 | -48.02 | -11.2 | -11.13 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -49.02 |

63. Table 1.c below illustrates the US ACP's cumulative compounded performance as compared to the ACP Comparators and its Prospectus Benchmark:

Table 1.c
**US ACP**
Cumulative Compounded Performance vs. the ACP Comparators and Prospectus Benchmark

| Fund / Benchmark | Cumulative Compounded Performance 2019 - 2025 | |
|---|---|---|
| | Cumulative Compound Performance | Underperformance vs. Comparator |
| **US ACP** | 81.17 | N/A |
| FSKAX | 192.46 | -111.29 |
| QKACX | 240.0 | -158.83 |
| FSAKX | 208.74 | -127.57 |
| PWCIX | 204.09 | -122.92 |
| *Delta* | 211.32 | -130.15 |
| DJ US TSM | 192.25 | -111.08 |

64. The assets in the US ACP have an approximate value of $788.5 million. Assuming that amount resulted from a cumulative compound growth of 81.17%, the original amount in 2019 would have been approximately $435.2 million. Had $435.2 million been invested in one of the

15

ACP Comparators, its value today would have been, on average, approximately $1.355 billion (or an increase in value for participants of approximately $566.45 million).

65.     The foregoing return, 3, 5, and 10-year trailing return, and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the US ACP and compared its performance to any of the ACP Comparators, or even its own Prospectus Benchmark.

66.     A prudent fiduciary monitoring the US ACP's performance would have compared its returns to one or more of the ACP Comparators identified in Table 1.b and Table 1.c.

67.     When considering whether to retain a U.S. all-company equity fund in a plan, a prudent fiduciary would evaluate the fund's risk and return characteristics as compared to the entire universe of comparable funds available based on qualitative and quantitative metrics.  A prudent fiduciary could not have reasonably concluded that retention of the US ACP was appropriate for the Plan.

**C.     The Capital Opportunity Fund Has Consistently Underperformed as Compared to Meaningful Benchmarks**

1.     The Capital Opportunity Fund and Its Benchmarks and Comparators

68.     The Capital Opportunity Fund has been part of the Plan since at least 2009.  The Capital Opportunity Fund's investment objective is to seek "long-term capital appreciation" by investing "mainly in U.S. stocks, with an emphasis on companies that are considered to have prospects for rapid earnings growth."  The fund's only underlying investment is a single mutual fund: the Vanguard Capital Opportunity Fund Admiral Shares (VHCAX).

69.     The Capital Opportunity Fund's prospectus benchmark was listed as the Russell Midcap Growth Index until mid-late 2025 ("COF Prospectus Benchmark").  Because the fund

16

changed benchmarks, Plaintiffs include data and performance comparisons against this benchmark through the end of 2024.

70.     As detailed below, the Capital Opportunity Fund has significantly underperformed comparable funds and benchmarks under both of the principal categorizations applied to the fund (Vanguard's Large Growth categorization and Morningstar's Large Blend categorization), on a trailing 3, 5, 10-year basis and a cumulative basis.  Plaintiffs present their analyses under both categorizations to demonstrate that the Capital Opportunity Fund underperformed regardless of which categorization framework is applied—establishing that retention of the fund was imprudent under any reasonable comparator framework.

71.     Vanguard categorizes the Capital Opportunity Fund as a "Large Growth" fund. Morningstar, by contrast, categorizes the Capital Opportunity Fund as "Large Blend."  This dual-categorization landscape is significant because the appropriate universe of comparator funds might differ depending on which category is applied.  Accordingly, to ensure the use of meaningful comparators to measure the performance of the Capital Opportunity Fund, Plaintiffs have identified two alternative suites of comparator funds for the Capital Opportunity Fund.  These comparator funds are offered by major market vendors and were selected based on their similar characteristics to Capital Opportunity Fund—characteristics such as size, category, and risk ratio. Had Defendants opted to replace the Capital Opportunity Fund, they likely would have worked with one of the comparator funds listed below.

72.     First, Plaintiffs have identified four comparator funds that are within the "Large Growth" Morningstar Category, and share similar investment objectives, sizes, portfolios, risk ratios, and risks as the Capital Opportunity Fund (the "Capital Opportunity Large Growth Comparators").  Second, Plaintiffs have identified four comparator funds that are within the "Large

Blend" Morningstar Category, and share similar investment objectives, sizes, portfolios, risk ratios, and risks as the Capital Opportunity Fund (the "Capital Opportunity Large Blend Comparators," and collectively with the Capital Opportunity Large Growth Comparators, the "Capital Opportunity Comparators").

73. The Large Growth Comparators are as follows:

| Fund | Capital Opportunity Large Growth Comparators[4] |
|---|---|
| **Capital Opportunity Fund** | DFA US Large Cap Growth Instl ("DUSLX") |
| | Janus Henderson Research N ("JRANX") |
| | JPMorgan Large Cap Growth R6 ("JLGMX") |
| | Putnam Large Cap Growth R6 ("PGOEX") |

74. The Capital Opportunity Large Growth Comparators and the Capital Opportunity Fund share comparable benchmarks, nearly full equity allocations, pronounced blended-cap orientations, similar investment objectives, sizes, portfolios, risk ratios, and risks. Considering Vanguard itself categorizes the Capital Opportunity Fund as part of the Large Growth category, the fund is properly compared to other large-capitalization growth-oriented equity funds.

75. Based on these similarities and Morningstar's inclusion of each of the Capital Opportunity Large Growth Comparators in the Large Growth category, the Capital Opportunity Large Growth Comparators represent meaningful comparators to the Vanguard Capital Opportunity Fund.

76. Alternatively, Plaintiffs have selected the following four Capital Opportunity Large Blend Comparators to analyze the performance of the Capital Opportunity Fund:

---

[4] The term "Capital Opportunity Large Growth Comparators" as used herein refers collectively to: (1) DUSLX, (2) JRANX, (3) JLGMX, and (4) PGOEX.

| Fund | Capital Opportunity Large Blend Comparators[5] |
|---|---|
| **Capital Opportunity Fund** | JPMorgan US Large Cap Core Plus I ("JLPSX") |
| | DFA US Large Company I ("DFUSX") |
| | T. Rowe Price All-Cap Opportunities Fund ("PRWAX") |
| | Fidelity Contrafund ("FCNTX") |

77.     The Capital Opportunity Large Blend Comparators and the Capital Opportunity Fund share comparable benchmarks, nearly full equity allocations, similar investment objectives, sizes, portfolios, risk ratios, and risks.  Based on these similarities and Morningstar's inclusion of the Capital Opportunity Fund and each of the Capital Opportunity Large Blend Comparators in the Large Blend category, the Capital Opportunity Large Blend Comparators represent meaningful comparators to the Vanguard Capital Opportunity Fund.

78.     Additionally, the Capital Opportunity Comparators and the Capital Opportunity Fund all maintain similar asset allocations, diversified across the same core sectors, including financials, healthcare, industrials, consumer sectors, and technology. For example, the Capital Opportunity Fund holds approximately 96.86% equities, and the Capital Opportunity Large Blend Comparators hold, on average 96.49% in equities (more specifically, JLPSX holds approximately 98.44%, DFUSX approximately 99.65%, PRWAX approximately 95.13%, and FCNTX approximately 92.72%).  Similarly, each of the Capital Opportunity Large Growth Comparators holds over 95% in equities.  This clustering in the mid-to-high 90% range demonstrates a strong alignment in overall equity exposure and strategy.

---

[5]     The term "Capital Opportunity Large Blend Comparators" as used herein refers collectively to: (1) JLPSX, (2) DFUSX, (3) PRWAX, and (4) FCNTX.

79. Because of their similarities, the Capital Opportunity Fund and each of the Capital Opportunity Comparators also share the same risks, including risks associated with the manager's selection of securities, and investment style risk.

80. The Capital Opportunity Comparators are all widely available institutional share-class mutual funds that pursue materially similar mandates and invest in similar segments of the equity market as the Capital Opportunity Fund. Accordingly, the Capital Opportunity Comparators represent meaningful peer funds against which a prudent fiduciary would evaluate whether the Capital Opportunity Fund delivered competitive performance and value for the Plan's participants.

81. Based on the similarities of the Capital Opportunity Fund's investment objectives, similar investment styles, portfolio construction approaches, and risks, the Capital Opportunity Comparators represent meaningful comparators to the Capital Opportunity Fund. When combined with its COF Prospectus Benchmark (Russell Midcap Growth Index), Plaintiffs have identified meaningful benchmarks that provide a sound basis of comparison to the Capital Opportunity Fund.

2. The Capital Opportunity Fund's Chronic Underperformance

82. As detailed below, the Capital Opportunity Fund has significantly underperformed both its COF Prospectus Benchmark, and its peer Capital Opportunity Comparators on a trailing 3, 5, and 10-year basis and a cumulative basis.

83. The Capital Opportunity Fund's underperformance has undermined the retirement savings of participants in the Plan since at least 2019. Table 1.a below illustrates the Capital Opportunity Fund's performance as compared to its COF Prospectus Benchmark based on: (i) yearly returns for the years 2015-2024; (ii) trailing three-year returns for the years 2017-2024; (iii) trailing five-year returns for the years 2019-2024; and (iv) a trailing ten-year return for 2024:

20

Table 2.a
**Capital Opportunity Fund**
Annual and 3-Year, 5-Year, and 10-Year Trailing Returns vs. Russell Midcap Growth[6]

| Fund/ Bench | Annual Performance | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| **Cap. Opp.** | 2.65 | 10.69 | 29.2 | -3.69 | 27.28 | 22.89 | 21.11 | -17.47 | 25.61 | 14.35 |
| Russell-Mid | -0.2 | 7.33 | 25.27 | -4.75 | 35.47 | 35.59 | 12.73 | -26.72 | 25.87 | 22.10 |
| *Alpha* | 2.85 | 3.36 | 3.93 | 1.06 | -8.19 | -12.7 | 8.38 | 9.25 | -0.26 | -7.75 |
| **Trailing 3** | - | - | 10.48 | 8.56 | -3.57 | -19.00 | -13.13 | 3.37 | 18.10 | 0.52 |
| **Trailing 5** | - | - | - | - | 2.51 | -12.99 | -8.76 | -4.09 | -5.34 | -4.89 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -2.5 |

84.     Table 2.b below illustrates the Capital Opportunity Fund's performance as compared to the Capital Opportunity Large Growth Comparators based on: (i) yearly returns for the years 2015-2025; (ii) trailing three-year returns for the years 2017-2025; (iii) trailing five-year returns for the years 2019-2025; and (iv) trailing ten-year return for the years 2024 and 2025:

Table 2.b
**Capital Opportunity Fund**
Annual and 3-Year, 5-Year, and 10-Year Trailing Returns vs. Large Growth Comparators

| Fund | Annual Performance | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Cap. Opp.** | 2.65 | 10.69 | 29.20 | -3.69 | 27.28 | 22.89 | 21.11 | -17.47 | 25.61 | 14.35 | 26 |
| DUSLX | 1.64 | 9.6 | 25.53 | -1.99 | 32.17 | 21.8 | 26.82 | -15.56 | 24.94 | 23.83 | 12.62 |
| JRANX | 5.6 | 1.64 | 26.39 | -2.62 | 35.59 | 32.94 | 20.55 | -29.86 | 43.27 | 35.24 | 18.55 |
| JLGMX | 7.94 | -1.74 | 38.37 | 0.57 | 39.39 | 56.42 | 18.79 | -25.21 | 34.95 | 34.17 | 14.4 |
| PGOEX | 1.45 | 6.8 | 31.45 | 2.69 | 36.9 | 38.89 | 22.95 | -30.1 | 44.71 | 33.7 | 14.62 |
| ***Delta*** | -1.51 | 6.62 | -1.24 | -3.35 | -8.73 | -14.62 | -1.17 | 7.71 | -11.36 | -17.39 | 10.95 |
| **Trailing 3** | - | - | 3.71 | 1.77 | -12.88 | -24.69 | -22.99 | -9.11 | -5.64 | -21.12 | -18.75 |
| **Trailing 5** | - | - | - | - | -8.52 | -20.7 | -26.49 | -19.83 | -26.47 | -33.44 | -13.5 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -39.11 | -31.41 |

---

[6]     While Plaintiffs include comparisons to the Russell Midcap Growth Index, considering Vanguard categorizes its fund as "Large Growth," and Morningstar categorizes this same fund as "Large Blend," Plaintiffs dispute that the Russell Midcap Growth Index was ever an appropriate benchmark for the Capital Opportunity Fund to begin with.

85.     Table 2.c below illustrates the Capital Opportunity Fund's performance as compared to the Capital Opportunity Large Blend Comparators based on: (i) yearly returns for the years 2015-2025; (ii) trailing three-year returns for the years 2017-2025; (iii) trailing five-year returns for the years 2019-2025; and (iv) trailing ten-year return for the years 2024 and 2025:

Table 2.c
**Capital Opportunity Fund**
Annual and 3-Year, 5-Year, and 10-Year Trailing Returns vs. Large Blend Comparators

| Fund | **Annual Performance** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| Cap. Opp. | 2.65 | 10.69 | 29.2 | -3.69 | 27.28 | 22.89 | 21.11 | -17.47 | 25.61 | 14.35 | 26 |
| JLPSX | -0.27 | 9.8 | 21.48 | -7.24 | 29.78 | 26.17 | 29.2 | -18.5 | 29.82 | 28.93 | 14.82 |
| DFUSX | 1.38 | 11.9 | 21.73 | -4.43 | 31.42 | 18.4 | 28.6 | -18.19 | 26.25 | 24.91 | 17.76 |
| PRWAX | 8.80 | 3.23 | 27.67 | -2.09 | 31.9 | 35.86 | 20.45 | -29.91 | 36.74 | 25.19 | 16.33 |
| FCNTX | 6.46 | 3.36 | 32.21 | -2.13 | 29.98 | 32.58 | 24.36 | -28.26 | 39.33 | 35.97 | 21.8 |
| *Delta* | -1.44 | 3.62 | 3.43 | 0.28 | -3.49 | -5.36 | -4.54 | 6.25 | -7.43 | -14.4 | 8.32 |
| **Trailing 3** | - | - | 5.62 | 7.47 | 0.1 | -8.41 | -12.81 | -4.02 | -6.11 | -15.81 | -14.16 |
| **Trailing 5** | - | - | - | - | 2.22 | -1.84 | -9.57 | -7.11 | -14.25 | -23.94 | -12.94 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -22.25 | -14.55 |

86.     Table 2.d below illustrates the Capital Opportunity Fund's cumulative compounded performance as compared to the Capital Opportunity Comparators:

22

Table 2.d
**Capital Opportunity Fund**
Cumulative Compounded Performance vs. the Capital Opportunity Comparators and COF
Prospectus Benchmark

| Fund / Benchmark | Cumulative Compounded Performance 2019 - 2025 | |
| --- | --- | --- |
| | Cumulative Compound Performance | Underperformance vs. Comparator |
| **Capital Opportunity** | 182.94 | N/A |
| DUSLX | 200.37 | -17.43 |
| JRANX | 250.09 | -67.15 |
| JLGMX | 301.24 | -118.29 |
| PGOEX | 262.39 | -79.44 |
| ***Delta*** | 253.52 | -70.58 |
| JLPSX | 231.36 | -48.41 |
| DFUSX | 204.01 | -21.07 |
| PRWAX | 201.27 | -18.33 |
| FCNTX | 254.76 | -71.81 |
| ***Delta*** | 222.85 | -39.91 |
| Russell Midcap | 133.2[7] | -8.64 |

87.     The assets in the Capital Opportunity Fund have an approximate value of $372.7 million.  Assuming that amount resulted from a cumulative compound growth of 182.94%, the original amount in 2019 would have been approximately $131.72 million.  Had $131.72 million been invested in one of the Capital Opportunity Comparators, its value today would have been, on average, approximately $445.47 million (or an increase in value for participants of approximately $72.77 million).

---

[7]     As noted, the Russell Midcap Growth Index was no longer used as the prospectus benchmark after 2024.  As such, this calculation compares the cumulative performance as between the Capital Opportunity Fund and the Russell Midcap Growth Index for the years 2019-2024 (124.56% - 133.2% = -8.64).

88.     The foregoing return, 3, 5, and 10-year trailing return, and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the Capital Opportunity Fund and compared its performance to any of the Capital Opportunity Comparators, or even its own COF Prospectus Benchmark.

89.     A prudent fiduciary monitoring the Capital Opportunity's performance would have compared its returns to one or more of the Capital Opportunity Comparators identified in Tables 2.b, 2.c, and 2.d.

90.     When considering whether to retain a large growth/large blend fund in a plan, a prudent fiduciary would evaluate the fund's risk and return characteristics as compared to the entire universe of comparable funds available based on qualitative and quantitative metrics.  A prudent fiduciary could not have reasonably concluded that retention of the Capital Opportunity Fund was appropriate for the Plan.

**D.      Defendants Violated Their ERISA Fiduciary Duties by Failing to Timely Remove the Consistently Underperforming Subject Funds**

91.     Each of the Defendants is, or during the Class Period was, a fiduciary of the Plan under ERISA.   Accordingly, Defendants were obligated to vigorously and independently investigate the merits of each of the investment options available to the Plan, using prudent methods in conducting such investigation.  29 U.S.C. § 1104(a)(1)(B).

92.     Defendants selected the US ACP and Capital Opportunity Fund as investment options in the Plan in approximately 2019 and 2009, respectively.  Since the Subject Funds were included as options, Defendants have encouraged participants to invest in them—as evidenced by, *inter alia*, (i) the US ACP being the only actively managed multi-manager U.S. all-company investment option available in the Plan; (ii) the Capital Opportunity Fund being the only single-manager large-capitalization U.S. focused growth equity option available in the Plan; and (iii) the

24

Subject Funds collectively representing approximately $1.16 billion, or 17.3%, of the Plan's total assets.

93.     Post-selection, as fiduciaries of the Plan, Defendants were responsible for monitoring the Subject Funds' performance with the skill of a prudent expert to determine whether their investment performance was in line with a meaningful investment index and funds within a recognized peer universe.

94.     As demonstrated, (i) the US ACP has consistently underperformed its Prospectus Benchmark and the ACP Comparators on a trailing three-year basis for up to seven consecutive years (2019-2025), a trailing five-year basis for up to six consecutive years (2020-2025), and a trailing ten-year basis by 2025, and on a cumulative basis; and (ii) the Capital Opportunity Fund has consistently underperformed its peer Capital Opportunity Comparators on a trailing three-year basis for up to seven consecutive years (2020-2025), a trailing five-year basis for up to seven consecutive years (2019-2025), and a trailing ten-year basis for up to two years (2024-2025), and on a cumulative basis.

95.     For example, if participants invested in the Subject Funds had invested their funds in one of the corresponding Comparator Funds in or around 2019, by today, those same amounts would have made, on average, $639.27 million more than those same funds made invested in the Subject Funds.[8]  Had Defendants fulfilled their duty with the care and skill of a prudent fiduciary, they would have seen in real-time that the Subject Funds underperformed their benchmarks and comparators.

---

[8]     This is the sum of the calculations set forth *supra* at ¶¶ 65, 88.

96. The Defendants' decision to retain the Subject Funds was as imprudent as it was injurious to the Plan and its participants. Over a decade of underperformance in comparison to peer benchmarks is difficult, if not impossible, to justify.

97. Defendants breached their fiduciary duty of prudence by retaining the Subject Funds—resulting in a devastating impact on Plaintiffs' and their fellow participants' retirement accounts, simultaneously impairing the Plan's overall investment performance and wasting millions in retirement savings.

98. Any fiduciary would have seen that the poor performance of the Subject Funds warranted the selection of new multi-cap, large growth, and/or large blend options—particularly given that such underperformance was sustained for up to eleven years.

99. The Defendants' breaches have had a profound adverse effect in the Plan and its participants. The overall breadth and depth of the Subject Funds' underperformance raise a plausible inference that Defendants' selection and monitoring process with respect to the Subject Funds was tainted by either a lack of competency, a lack of loyalty, a complete failure of effort, or some combination of the above.

## CLASS ACTION ALLEGATIONS

100. Plaintiffs bring this action as a class action on behalf of all participants and beneficiaries of the Plan pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and/or (b)(3). Specifically, Plaintiffs bring this action on behalf of:

> All participants and beneficiaries of the Plan who, from [date] through the date of judgment, invested in one or more of the:
>
> (i)   U.S. All Company Portfolio Fund; and
>
> (ii)  Vanguard Capital Opportunity Fund
>
> The Class excludes Defendants, any officers and directors of Aon, at all relevant times or employees with responsibility for the Plan's investment or

26

administrative functions, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

101.     This action may be certified as a Class under Rule 23(a)(1) as the members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are approximately 25,000 members of the proposed Class.  Members of the Class may be identified from records maintained by Aon and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

102.     Plaintiffs' claims are typical of the claims of the members of the Class as each Plaintiff was a participant during the Class Period and all participants in the Plan were harmed by Defendants' misconduct.

103.     Plaintiffs will fairly and adequately protect the interests of the members of the Class as they each participated in the Plan during the Class Period, are committed to vigorous representation of the Class, and have retained counsel competent and experienced in class litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

104.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class because Defendants owed the same fiduciary duties to the Plan and all participants and beneficiaries and took a common course of conduct as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. Among the questions of law and fact common to the Class are:

(a)     whether each of the Defendants is a fiduciary liable for the remedies provided by 29 U.S.C. § 1109(a);

(b)  whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by employing an imprudent process for monitoring and evaluating Plan's investment options;

(c)  whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by failing to employ a prudent process for monitoring and evaluating Plan's investment performance and strategy;

(d)  whether Plaintiffs' claims of an imprudent process require similar inquiries and proof of the claims and therefore implicate the same set of concerns for all proposed members of the Class;

(e)  what are the losses to the Plan resulting from each breach of fiduciary duty;

(f)  what Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duties; and

(g)  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

105.  Certification under Rule 23(b)(1) is appropriate as prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a).  Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

28

106. Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Plaintiffs seek reformation of the Plan to include more viable retirement investment options, which will benefit the Plan and other participants in the Plan.

107. Additionally, or in the alternative, this action may be certified as a Class under Rule 23(b)(3) as questions of law or fact common to members of the Class predominate over any questions affecting individual members of the Class, and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT I
**Breach of Duty of Prudence for Failing to Remove Imprudent Investments from the Plan Within a Reasonable Time**
**(Violation of ERISA, 29 U.S.C. § 1104)**
**(Against All Defendants)**

108. All allegations set forth in the Complaint are realleged and incorporated herein by reference.

109. Aon used the Plan as a strategic and financial benefit to recruit and retain workers.

110. In joining Aon and subsequently enrolling in the Plan, employees trusted and relied on Aon's resources and expertise to construct and maintain a state-of-the-art retirement plan.

111. At all relevant times during the Class Period, Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets.

112. 29 U.S.C. § 1104(a)(1)(B) requires a plan fiduciary to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

29

capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

113. Thus, the scope of the fiduciary duties and responsibilities of Defendants includes administering the Plan with the care, skill, diligence, and prudence required by ERISA. Defendants are responsible for evaluating and monitoring the Plan's investment options on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure the Plan's assets are invested prudently.

114. Defendants breached their fiduciary duties by adopting an imprudent process for evaluating and monitoring investment options in the Plan. The faulty process resulted in the Plan's inclusion of two imprudent funds, a multi-cap fund (the US ACP) and a large growth/blend fund (the Capital Opportunity Fund)—both of which exhibited chronic poor performance for over a decade. Defendants failed to remove the Subject Funds despite historical underperformance relative to meaningful benchmarks and relevant benchmark indices.

115. By failing to adequately consider better-performing investment products for the Plan, Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

116. Defendants' breaches of fiduciary duty have substantially impaired the Plan's value and investment performance for all Class Members.

117. As a direct and proximate result of Defendants' breaches of fiduciary duty, the Plan and its participants have suffered over $120 million of damages and lost-opportunity costs which continue to accrue and for which Defendants are jointly and severally liable pursuant to 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a).

118.     Each of the Defendants is liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

119.     Each Defendant also participated in the breach of the other Defendants, knowing that such acts were a breach, and enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties.  Each Defendant knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary duties under 29 U.S.C. § 1105(a).

### COUNT II
**Failure to Monitor**
**(Against All Defendants)**

120.     All allegations set forth in the Complaint are realleged and incorporated herein by reference.

121.     Defendants had a duty to monitor the performance of each individual to whom they delegated any fiduciary responsibilities.  A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of the Plan's assets, and must take prompt and effective action to protect the Plan and participants when they are not.

122.     To the extent any Defendant's fiduciary responsibilities were delegated to another fiduciary, such Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

123.     Defendants breached their fiduciary monitoring duties by, among other things:

31

(a)    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions with respect to the Plan;

(b)    failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

(c)    failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that the investment options were prudent; and

(d)    failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan to the detriment of Plan's participants' retirement savings.

124.    Each fiduciary who delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

(a)    failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions with respect to the Plan;

(b)    failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

(c)    failing to implement a process to ensure that the appointees monitored the performance of Plan investments; and

(d)     failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan, all to the detriment of Plan participants' retirement savings.

125.    As a direct result of these breaches of the fiduciary duty to monitor, the Plan has suffered substantial losses.  Had Aon and the other delegating fiduciaries prudently discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

## PRAYER FOR RELIEF

126.    For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

(a)     find and adjudge that Defendants have breached their fiduciary duties, as described above;

(b)     find and adjudge that Defendants are personally liable to make good to the Plan the losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

(c)     find and adjudge that Defendants are liable to the Plan for appropriate equitable relief, including but not limited to restitution and disgorgement;

(d)     determine the method by which the Plan's losses under 29 U.S.C. § 1109(a) should be calculated;

(e)     order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

(f)     remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

33

(g)      impose a surcharge against Defendants and in favor of the Plan in the amount of all sums involved in any transactions;

(h)      reform the Plan to include only prudent investments;

(i)      certify the Class, appoint Plaintiffs as class representatives, and appoint Kahn Swick & Foti, LLC as Class Counsel;

(j)      award to the Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

(k)      order Defendants to pay interest to the extent allowed by law; and

(l)      grant such other equitable or remedial relief as the Court deems appropriate.

Dated:  May 22, 2026                             Respectfully Submitted,

                                                 /s/ Matthew T. Hurst
                                                 Matthew T. Hurst
                                                 **HEFFNER HURST**
                                                 30 North LaSalle Street, Suite 2121
                                                 Chicago, Illinois 60602
                                                 Telephone: (312) 346-3466
                                                 mhurst@heffnerhurst.com

                                                 Melinda A. Nicholson
                                                 Nicolas Kravitz
                                                 John A. Carriel
                                                 Alexander L. Burns
                                                 **KAHN SWICK & FOTI, LLC**
                                                 1100 Poydras Street, Suite 960
                                                 New Orleans, LA 70163
                                                 Telephone: (504) 648-1842
                                                 Facsimile: (504) 455-1498
                                                 Email: melinda.nicholson@ksfcounsel.com
                                                 Email: nicolas.kravitz@ksfcounsel.com
                                                 Email: john.carriel@ksfcounsel.com
                                                 Email: alexander.burns@ksfcounsel.com

                                                 *Attorneys for Plaintiffs, the Plan, and the
                                                 Proposed Class*

34